MGD

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David M. Getzen,<br><br>                Plaintiff,<br><br>v.<br><br>Yavapai County, et al.,<br><br>                Defendants. | No. CV 18-08093-PCT-SRB (DMF)<br><br>**ORDER** |

Plaintiff David M. Getzen, who is currently confined in the Arizona State Prison Complex-Tucson, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983. Defendant Jeff Long, a Yavapai County Sheriff's Office (YCSO) Deputy, moves for summary judgment based on qualified immunity. (Doc. 110.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), and he opposes the Motion. (Docs. 114, 117.) Also pending is a one-page document filed by Plaintiff, titled "request of Rule 56. A summary judgement," which was docketed as a Motion for Summary Judgment. (Doc. 118.)

The Court will deny both motions.

**I.      Background**

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a Fourth Amendment excessive force claim in Count One against Defendant Long and directed Long to answer the claim. (Docs. 30, 35.) The Court dismissed the remaining claims and Defendants. (Doc. 30.)

**II.     Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.    Plaintiff's Motion for Summary Judgment**

Plaintiff fails to set forth or discuss the relevant legal standards for obtaining summary judgment, and he did not file a statement of facts with his Motion for Summary

Judgment. (Doc. 118.) Plaintiff's Motion fails to comply with the Local and Federal Rules of Civil Procedure governing summary judgment motions and the Motion will be summarily denied. *See, e.g.,* Fed. R. Civ. P. 56(c); LRCiv 56.1(a) (requiring a separate statement of facts that refers to the specific admissible portion of the record where the facts find support).

**IV.    Defendant's Motion for Summary Judgment**

   **A.    Relevant Facts**

On August 2, 2016, Defendant was dispatched to an agency assist call at the Cornville Fire Department. (Doc. 111 (Def.'s Statement of Facts) ¶ 1.) When Defendant arrived, he learned that a female subject, later identified as Terry Kampfe, had contacted the Fire Department to report a male subject in her apartment who would not leave and had taken her cell phone by force and removed the battery from it. (*Id.* ¶ 2.) Kampfe identified the male subject as Dave, who was later identified as Plaintiff David Getzen, and she told Defendant that Plaintiff would not leave her apartment. (*Id.* ¶¶ 4-5.) Kampfe, who smelled of alcohol, said Plaintiff was intoxicated, that she had asked him to leave her apartment, but he would not leave, had verbally abused her, and had taken her keys and cell phone and removed the battery from the phone to prevent her from contacting law enforcement. (*Id.* ¶¶ 6-7.) Defendant asked Kampfe if Plaintiff was violent and armed, and she said Plaintiff was not armed with any weapons, but she was unsure if he would be violent towards law enforcement. (*Id.* ¶ 8.)

Defendant walked across the street to Kampfe's apartment and knocked on the door several times, but Plaintiff did not answer. (*Id.* ¶ 10.) Defendant had Kampfe walk over to her apartment and unlock the front door. (*Id.* ¶ 11.) Once she did, Defendant could see into the living room area and called into the apartment in a loud voice and announced that he was from the Sheriff's Office and advised Plaintiff to exit if he was inside. (*Id.* ¶ 12.) Defendant received no answer and stated several times that he would be searching the apartment soon; he also announced that for officer safety, if Plaintiff was hiding inside, he could be subjected to pepper spray or tased. (*Id.* ¶¶ 13-14.)

YCSO Deputy Hearl then arrived at the location, and Defendant briefed Hearl on the information he had, including that Plaintiff was intoxicated, 6'01" tall, 240 pounds, and was refusing to leave. (*Id.* ¶ 15.) Defendant then advised dispatch they were going to clear the apartment and requested that all radio traffic be held. (*Id.* ¶ 16.) As Defendant and Deputy Hearl cleared the apartment, Defendant continuously repeated "Sheriff's Office, if you are inside you need to come out now." (*Id.* ¶ 17.) The Deputies first cleared the downstairs portion of the residence and then moved upstairs, which Kampfe had advised was a studio type room with a bathroom. (*Id.* ¶ 18.) As the Deputies moved upstairs, Defendant stated, "Sheriff's Office, we're coming up, if you're in here, show me your hands." (*Id.* ¶ 19.)

The Deputies cleared the main portion of the upper room. (*Id.* ¶ 20.) The bathroom door was closed, and Defendant told Deputy Hearl to wait before opening the door and again advised Plaintiff to exit if he was inside. (*Id.* ¶¶ 20, 21.) Deputy Hearl then opened the bathroom door; Defendant did not see anyone but noticed that the bathroom curved to the right. (*Id.* ¶ 22.) Deputy Hearl entered with his weapon drawn and started giving Plaintiff verbal commands to show his hands and to stand up, but Plaintiff did not comply with the commands. (*Id.* ¶ 23.) Defendant holstered his weapon and drew his Taser. (*Id.* ¶ 24.)

Defendant saw Plaintiff—a large man—sitting on the floor with his back to the wall and observed that Plaintiff was still failing to follow Deputy Hearl's commands. (*Id.* ¶ 25.) Defendant fired his Taser in probe mode, but Plaintiff removed one of the probes; the Taser seemed to have no effect on Plaintiff. (*Id.* ¶ 26.) Defendant told Plaintiff to get onto his belly, but Plaintiff did not do so. (*Id.* ¶ 27.) Defendant then pepper sprayed Plaintiff in the face, but Plaintiff still failed to follow instructions to get on his face and put his hands behind his back. (*Id.* ¶ 28.) Defendant removed the cartridge from his Taser and applied a drive-stun to Plaintiff in the back of the thigh and calf, commanded Plaintiff to put his hands behind his back, and pepper sprayed him once more. (*Id.* ¶ 29.) At that point, Plaintiff complied with instructions to put his hands behind his back, and Defendant was

able to place handcuffs on him. (*Id.* ¶ 30.) Plaintiff was laying on his chest, unable to stand, and Defendant dragged Plaintiff from the bathroom by his feet, which resulted in a cut to Plaintiff's face. (*Id.* ¶ 31.)

Defendant advised dispatch of the use of force and for medical to respond. (*Id.* ¶ 32.) Plaintiff was evaluated on the scene, transported to Verde Valley Medical Center for further evaluation, and was released by hospital staff, who declared Plaintiff fit for continued custody. (*Id.* ¶ 33.)

Plaintiff did not file a controverting statement of facts or specifically refute any of Defendant's facts, but Plaintiff does state in his response that he lived at the apartment and paid rent. (Doc. 117 at 4.)[1] Plaintiff claims he did not leave the apartment because he was legally residing there based on an agreement with Terry Kampfe and hid in the bathroom because he feared for his safety due to past experiences with the YCSO. (*Id.*; Doc. 28 at 8.) Once Defendant found Plaintiff in the bathroom, he alleges there was "no conflict between the two, no violent act on [Plaintiff's] part—no resisting." (Doc. 28 at 8.) Plaintiff claims the pepper spray caused breathing problems and 16 hours of blindness, the Taser caused a heart injury, and he was in the ER for over 3 hours. (Doc. 124 at 3-4.) Plaintiff was not charged "with resisting/or assault," but was charged with disorderly conduct. (Doc. 117 at 4; Doc. 28 at 9.)

### B. Fourth Amendment Excessive Force Legal Standard

"*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original).

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis, assessing (1) the nature of force inflicted; (2) the

---

[1] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect was resisting arrest or attempting to evade arrest by flight (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396-97 and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). "These factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (citations omitted). "Other relevant factors include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033-34 (9th Cir. 2018); *see Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (considering officer's failure to warn plaintiff that he would be shot if he did not comply with the officer's orders and what other tactics, if any, were available to effect the arrest in determining whether force used was reasonable); *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001). "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Under the Fourth Amendment reasonableness standard, a court considers certain objective factors and does not consider the defendant

officer's intent or motivation. *See id.* at 397, 399 ("subjective concepts like 'malice' and 'sadism' have no proper place in [this] inquiry").

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

**C.     Discussion**

**1.      Nature of the Force Inflicted**

The evidence reflects that once the Deputies located Plaintiff, Defendant used his Taser in probe (also known as "dart") mode, pepper sprayed Plaintiff, used the Taser a second time in drive-stun mode, and pepper sprayed Plaintiff once more. A Taser in dart mode delivers "a 1200 volt, low ampere electrical charge" that "instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body and leaving the target limp and helpless." *Mattos*, 661 F.3d at 443 (internal citation and quotation omitted). Tasers used in dart mode "constitute an intermediate, significant level of force." *Id.* When a Taser is in drive-stun mode, "the operator removes the dart cartridge and pushes two electrode contacts located on the front of the [T]aser directly against the victim. In this mode, the [T]aser delivers an electric shock to the victim, but it does not cause an

override of the victim's central nervous system as it does in dart-mode." *Id*. The Ninth Circuit in *Mattos* did not determine the level of force when a Taser is used in drive-stun mode but found that such a determination was unnecessary to assess the reasonableness of the tasing. *Id*. The Ninth Circuit has found that the use of pepper spray constitutes "intermediate force" because, although non-lethal, it is designed to cause intense pain and is constitutes "a significant intrusion." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011).

The Court finds that the amount of force used against Plaintiff was a significant, intermediate level of force and must be justified by a similar level of "government interest [that] compels the employment of such force." *See Deorle*, 272 F.3d at 1280.

### 2. Governmental Interests

Whether the above intermediate, significant uses of non-lethal force were reasonable depends on the government interests at stake, which requires analyzing the severity of Plaintiff's crime, the threat posed by Plaintiff, and whether Plaintiff was resisting or evading arrest. *Espinosa*, 598 F.3d at 537; *Graham*, 490 U.S. at 396-97.

### a) Severity of the Crime

It is undisputed that Defendant was responding to a domestic disturbance call, that Plaintiff refused to leave the apartment when asked to do so, had verbally abused Kampfe, and had taken her keys and removed her cell phone battery so she could not contact law enforcement. Defendant also presents evidence that Plaintiff was booked on charges of "disorderly conduct per domestic violence" and preventing the use of a telephone during an emergency.[2] (Doc. 111-1 at 12.) Although Plaintiff's offenses were not extremely serious, there was a governmental interest in investigating him. *Miller*, 340 F.3d at 964 (government has a legitimate interest in apprehending criminal suspects).

Defendant argues that while the charges are not particularly grave, the circumstances here involving a domestic violence situation and the willingness of one party to take steps to prevent reporting to law enforcement "makes them severe enough to justify

---

[2] Defendant does not say what happened to those charges after Plaintiff was booked.

- 8 -

an elevated need for force." (Doc. 110 at 11.) Defendant cites to *Mattos*, where the Ninth Circuit observed that "'[t]he volatility of situations involving domestic violence'" makes them particularly dangerous. *United States v. Martinez,* 406 F.3d 1160, 1164 (9th Cir. 2005)).

The circumstances in this case are similar to the situation considered by the Ninth Circuit in *Smith v. City of Hemet*, where officers responded to a report of domestic violence. When officers arrived, the plaintiff, Smith, was standing alone on his porch in his pajamas, was separated from his wife, and had no guns or weapons in his possession. *Smith*, 394 F.3d at 702-03. Smith repeatedly refused to take his hands out of his pockets or put his hands on his head and come down off the porch, and he re-entered the home once. *Id*. at 696-97. When Smith re-emerged, officers threw Smith down on the porch, pepper sprayed him, and ordered a canine to attack Smith, which the dog did. *Id*. at 694. The Ninth Circuit found that the domestic violence offense under those circumstances "did not warrant the conclusion that Smith was a particularly dangerous criminal or that his offense was especially egregious" justifying the use of physical force. *Id*. at 703.

In this case, the only information the Deputies had was that Plaintiff was refusing to leave Kampfe's apartment, had verbally abused Kampfe, and had taken the battery out of Kampfe's cell phone so she could not call law enforcement. Kampfe had left the apartment before Defendant and Deputy Hearl arrived, so she was away from any potential danger posed by Plaintiff. Kampfe told Defendant that Plaintiff was intoxicated and not armed and that she was unsure if he would use violence against law enforcement. There is no evidence that Plaintiff had a weapon or verbally or physically interacted with the deputies. The only evidence is that Plaintiff was sitting on the bathroom floor with his back to the wall when the Deputies found him and refused to show his hands. Under these circumstances, "the nature of the crime at issue provides little, if any, basis for the officers' use of physical force." *Smith*, 394 F.3d at 703. On this record, the first *Graham* factor favors Plaintiff.

. . . .

### b) Threat to Officers or Others

The "most important *Graham* factor" is whether the plaintiff "posed an immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441. But "[a] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281.

Defendant argues that Plaintiff posed an immediate threat to his and Deputy Hearl's safety "when he retreated to a confined area, refused to show himself, refused to show his hands, and continued to both passively and actively resist."[3] (Doc. 110 at 12.) Defendant argues that in addition to being a large, intoxicated man who had taken actions to prevent his friend from calling law enforcement, the Deputies did not know if Plaintiff had access to weapons or if he would resort to violence. (*Id.*)

Defendant has not presented any evidence of what Plaintiff was doing once they encountered him that constituted an immediate threat to their safety. According to Defendant's facts, Plaintiff was sitting on the floor of the bathroom with his back against the wall. Defendant does not say Plaintiff made any threatening statements or gestures that put them in immediate fear for their safety. There is also no evidence that Plaintiff actively resisted arrest. Because the record does not support that Plaintiff posed an *immediate* threat to the Deputies' safety, this factor favors Plaintiff.

### c) Resisting Arrest or Fleeing

It is undisputed that Plaintiff did not exit the residence, show himself, or show his hands, despite repeated commands to do so. Instead, Plaintiff hid from the Deputies, who had identified themselves, and they had to search the residence to locate him in the upstairs bathroom. Even if Plaintiff had fled the apartment, the Ninth Circuit has found that when a suspect flees, but then hides, the suspect's flight has terminated, at least temporarily. *Chew v. Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994). Based on this record, there is no evidence Plaintiff was fleeing that justifies the use of force.

---

[3] As the Court discusses later, Plaintiff's actions were more akin to passive resistance, and Defendant does not say what actions by Plaintiff constituted active resistance.

- 10 -

Plaintiff was attempting to evade arrest by hiding from the Deputies, but there is no evidence that he actively resisted arrest. At most, Plaintiff passively resisted arrest by not complying with the Deputies' commands. The Ninth Circuit has "long distinguished between passive and active resistance." *Rice v. Morehouse*, 989 F.3d 1112, 1123 (9th Cir. 2021) (finding that the plaintiff's refusals to exit his car are far closer to "the purely passive protestor who simply refuses to stand" than to the "minor" or even "truly active" forms of resistance that the court has considered in other cases) (citing *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994) (finding that anti-abortion demonstrators were passively resisting by remaining seated and refusing to move when police attempted to remove them from a medical building) and *Bryan*, 630 F.3d at 830 (construing the plaintiff's refusals to remain in his car, even given his shouting and self-hitting, as relatively passive)).

Because the record does not support that Plaintiff was either actively resisting or fleeing to avoid arrest, this factor favors Plaintiff.

### 3. Alternative Means Available

The Court may also consider whether alternative methods were available for subduing a suspect. *Chew*, 27 F.3d at 1441 n.5. Police officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Glenn v. Wash. Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). But "police are 'required to consider [w]hat other tactics if any were available,'" and if there were "clear, reasonable and less intrusive alternatives" to the force employed, that "militate[s] against finding [the] use of force reasonable." *Id.* (quoting *Bryan*, 630 F.3d at 831).

Defendant does not specifically address this factor but does state in his affidavit that using pepper spray and a Taser was the least amount of force to attain compliance from Plaintiff, who was not following commands and it was not known whether he had any weapons. (Doc. 111-1 at 7 ¶¶ 79, 80.)

It is not clear to the Court that using a Taser and pepper spray was the least amount of force available in these circumstances where there is no indication that Plaintiff made any movement toward the Deputies or even said anything. Defendant does not say that he and Deputy Hearl attempted to make any physical contact with Plaintiff such as lifting him up from his seated position and cuffing him. There is a question of fact whether Defendant had alternative means for gaining Plaintiff's compliance.

### 4. Whether the Force Used was Necessary

Plaintiff does not dispute that he did not comply with the Deputies' commands after the initial use of the Taser in dart mode and pepper spray, and it was not until Defendant used the Taser in drive-stun mode and pepper sprayed Plaintiff a second time that Plaintiff complied with commands to put his hands behind his back. There is no allegation that Defendant used further force once Plaintiff complied with the commands to put his hands behind his back. There is also no dispute that Defendant warned Plaintiff that he may be pepper sprayed or tased if he did not show himself.

Nevertheless, there is no evidence that Plaintiff had a weapon, physically resisted arrest, was belligerent or said anything to the Deputies, or did anything other than hide from the Deputies and fail to comply with the Deputies' commands. When Defendant finally encountered Plaintiff in the bathroom, Plaintiff was seated on the floor with his back against the wall. While Defendant asserts that Plaintiff did not comply with Deputy Hearl's command to show his hands, Defendant does not say where Plaintiff's hands were, or that he feared Plaintiff was hiding a weapon with his hands, and Defendant does not say how much time elapsed between each use of force or command to comply such that a trier of fact could conclude that each use of force was ineffective and that escalating the use of force was even necessary.

There is a question of fact whether the level of force used—a Taser used in both dart and drive-stun modes and pepper spray used twice—was necessary to gain Plaintiff's compliance, especially given that there is no evidence that Plaintiff actively resisted arrest, Plaintiff was never charged with resisting arrest or assault, but was only booked on charges

of disorderly conduct related to domestic violence and preventing the use of a telephone during an emergency.

### D.     Qualified Immunity

Qualified immunity shields government officials under § 1983 unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, –– U.S. ––, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Courts may address either prong first depending on the circumstances in the particular case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle*, 566 U.S. at 664). The Supreme Court "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Court will address the second prong of the qualified immunity analysis because the Court has already determined there is a question of fact whether Defendant violated Plaintiff's Fourth Amendment rights. To defeat qualified immunity in this case, Plaintiff must show that as of August 2, 2016, a reasonable officer would have understood that using a Taser and pepper spray on a suspect involved in a domestic disturbance who hid from law enforcement officers, was warned that a Taser and pepper spray may be used, and who did not comply with officer commands to show his hands and lay on the ground when officers encountered him, was unconstitutional.

Defendant argues that officers "who use Taser devices on individuals actively resisting arrest, or refusing lawful police commands, are uniformly granted qualified immunity against excessive force claims." (Doc. 110 at 14.) Defendant cites two Ninth

Circuit cases and multiple out-of-circuit cases.[4] In one Ninth Circuit case, *Mattos*, the court found that the officer defendants were entitled to qualified immunity in two consolidated cases even though the officers used excessive force against the two plaintiffs. 661 F.3d at 452. In one situation, the officers tased a pregnant woman in drive-stun mode three times in one minute after she refused to sign a traffic citation, but the court found the law was not sufficiently clear at the time of the incident in 2004 to "render the alleged violation clearly established." *Id.* at 448. In the second case, officers, without warning, used a Taser in dart mode against a woman who touched an officer while attempting to defuse a domestic disturbance, but the court concluded that the alleged constitutional violation "was not clearly established when the conduct occurred" in 2006, particularly since there was no Supreme Court or Ninth Circuit decision addressing the use of a Taser in dart mode. *Id.* at 452.

The second Ninth Circuit case cited by Defendant involved an unarmed, large, mentally disturbed man named Tereschenko who was refusing family members' request to move out. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938 (9th Cir. 2017). Tereschenko became agitated when two deputies called to the scene named Gray and Barry told Tereschenko they were taking him to the hospital. *Id.* at 943. Deputy Gray tased Tereschenko in drive-stun mode, and Tereschenko reacted violently to the tasing by punching Deputy Barry to the point where Barry almost passed out. *Id.* at 950-51. Deputy Gray jumped on Tereschenko's back, and Tereschenko pushed Gray off and moved towards Deputy Barry; Barry then fired three shots and killed Tereschenko. *Id.* The Ninth Circuit held that the use of deadly force in that instance was not excessive and there was no precedent clearly establishing that Deputy Barry's use of deadly force was unreasonable, thereby entitling Deputy Barry to qualified immunity. *Id.* at 952-53.

After those two cases were decided, the Ninth Circuit "clearly established one's 'right to be free from the application of non-trivial force for engaging in mere passive

---

[4] The other cases Defendant cites are from the Fifth, Sixth, Eighth, Tenth, and Eleventh Circuits and all appear to involve parties who were actively resisting arrest.

- 14 -

resistance.'" *Rice*, 989 F.3d at 1125 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) (holding that an officer's tasing of a bystander to an arrest who did not retreat upon the officer's orders violated clearly established law because the bystander did not make any threats or resist the officer, making "the use of non-trivial force *of any kind* [ ] unreasonable") and *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (explaining that cases dating back to 2001 established that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force")).

In *Rice*, the Ninth Circuit, in accepting the plaintiff's facts as true, found that the plaintiff was engaged in passive resistance when, in December 2011, he was stopped by police for failing to signal, declined to provide his driver's license and registration, and asked to speak to the officer's supervisor. *Rice*, 989 F.3d at 1116, 1127. Officers pulled the plaintiff out of the car, tripped the plaintiff so that he fell to the ground, and pinned him down and handcuffed him, resulting in long-term physical injuries and emotional distress. *Id*. The court found that although the plaintiff was upset and insisted on speaking to a supervisor, the plaintiff did not physically resist arrest and did not swear or threaten the officers. *Id*. The court reversed the grant of summary judgment to the officers on the basis of qualified immunity because "the line of cases discussed in *Gravelet-Blondin* clearly established the law long before [the officers'] take-down of Rice." *Id*.

The *Rice* court cited several other cases that established the right to be free from the application of non-trivial force against someone engaged in passive resistance. *Rice*, 989 F.3d at 1112 (citing, e.g., *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1158 (9th Cir. 2011) (denying qualified immunity to an officer "who physically struck and used pepper spray against an arrestee who refused to reenter his vehicle"); *Bryan*, 630 F.3d 805 (holding that "it was excessive for an officer to use a [T]aser against a person who, although shouting gibberish, hitting himself, and disobeying the officer's instructions to reenter his car, was otherwise non-resistant"); *Deorle*, 272 F.3d at 1277, 1281 (denying qualified immunity to an officer "who shot a beanbag projectile at a suicidal and irrational individual who

followed the officer's instructions to put down his crossbow but who then walked towards the officer at a steady gait"); *Headwaters Forest Defense v. Cnty. of Humboldt*, 276 F.3d 1125, 1131 (9th Cir. 2002) (holding that the law was sufficiently clear in 1997 to put officers on notice that the use of pepper spray to subdue, remove, or arrest nonviolent protesters was excessive)).

Plaintiff was passive when the officers encountered him, engaged in no active resistance, and did nothing that was bellicose or belligerent. The line of cases prior to August 1, 2016 clearly established that the use of intermediate force against someone engaged only in passive resistance was unlawful. Applying the principles set forth in cases such as *Rice*, *Gravelet-Blondin*, *Nelson*, *Bryan*, *Deorle*, and *Headwaters*, Defendant is not entitled to qualified immunity, and the Court will deny summary judgment to Defendant.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendant's Motion for Summary Judgment (Doc. 110) and Plaintiff's Motion for Summary Judgment (Doc. 118), and the Motions are **denied**.

(2) Magistrate Judge Camille D. Bibles having been randomly drawn, IT IS ORDERED referring this matter to Magistrate Judge Bibles to conduct a settlement conference as to Plaintiff's excessive force claim in Count One.

(3) Defense Counsel must arrange to jointly call Magistrate Judge Bibles' chambers at (928) 774-2566 within **14 days** of the date of this Order to schedule a date for the settlement conference.

Dated this 9th day of August, 2021.

_Susan R. Bolton_
Susan R. Bolton
United States District Judge